Charles C. **HOLMAN**, Jr., Plaintiff,

v.

Gary J. **HILTON**, Superintendent, New Jersey State Prison at Trenton; Alan R. Hoffman, Former Superintendent, New Jersey State Prison at Trenton; William Baum, Investigations Officer, New Jersey State Police; Lawrence Ashton, Lieutenant, New Jersey State Prison; James Williams, Lieutenant, New Jersey State Prison at Trenton; individually and in their official capacities, Defendants.

Civ. A. Nos. 79–2452, 77–2067.

United States District Court,
D. New Jersey.

July 9, 1982.

Stanley C. Van Ness, Public Defender by Arthur Penn, Asst. Deputy Public Defender, East Orange, N. J., for plaintiff.

Irwin I. Kimmelman, Atty. Gen. of the State of N. J. by Peter Freed, Deputy Atty. Gen., Trenton, N. J., for defendants.

OPINION

DEBEVOISE, District Judge.

This summary judgment motion presents a challenge to the constitutionality of N.J. S.A. 59:5–3, a New Jersey statute which bars the commencement of any action in the state courts "by or on behalf of a prisoner against a public entity or public employee until such prisoner shall be released from confinement." For the reasons which follow, I conclude that the statute is unconstitutional and will grant judgment in plaintiff's favor.

1. *Background*

The parties are in agreement upon the facts essential to a resolution of the motion.

Plaintiff, Charles C. Holman, was convicted of murder in the state courts of New Jersey in 1970 and sentenced to a life term of imprisonment. From the time of his conviction until December, 1981, he was incarcerated in various institutions in the New Jersey state prison system.[1]

On August 2, 1976, while an inmate at Trenton State Prison, plaintiff filed a complaint in replevin in the District Court of Mercer County, New Jersey. Naming several prison officials as defendants, plaintiff sought the return of certain items of impounded personal property or, in the alternative, damages of $613. In his state court complaint, plaintiff made the following allegations:

—During the early morning hours of January 20, 1976, following an aborted escape attempt from the prison wing in which he was housed, guards entered the wing, ordered all inmates, including plaintiff, to strip and escorted them to "strip" cells in a separate area of the prison. Prison officials then searched the emptied cells for contraband.

—On February 25, 1976, while plaintiff was still housed in a separate area of the

---

1. In December, 1981, following a series of disturbances at Trenton State Prison in which plaintiff was alleged to have been involved, state corrections officials ordered plaintiff's transfer to an out-of-state facility. In an opinion dated January 15, 1982, I upheld the legality of the transfer. *Holman v. Hilton*, Nos. 80–178 and 77–2067 (D.N.J. Jan. 15, 1982).

prison, the authorities provided him with an inventory slip purporting to list all the personal property contained in his former cell and delivered the items listed to his new cell. Plaintiff immediately protested that a number of his possessions were missing. Defendants informed him that the missing items had been "impounded" during the cell search by the State Police.

—Plaintiff then prepared a detailed list of his missing property utilizing mail room receipts and submitted the list to his wing supervisor. Among the items listed were: 65 stereo record albums, a Timex quartz watch and a set of diamond engagement rings. When no response was forthcoming from the wing supervisor, plaintiff directed a letter to the superintendent of the prison requesting the return of his property. Still, however, his possessions were not returned.

—On May 28, 1976, plaintiff served upon Alan R. Hoffman, Superintendent of Trenton State Prison, Lt. Lawrence Ashton, his wing supervisor, and Major William Baum, the Head Investigations Officer of the New Jersey State Police, a formal "Notice of Demand" for the return of his property, pursuant to New Jersey Court Rule 4:61–2.[2] When this approach failed, he commenced his action in replevin on August 26, 1976 in the Mercer County District Court.

Shortly after plaintiff filed his state court action, the defendants moved for summary judgment, arguing that they did not have the property sought to be replevied and that the action for damages was barred by N.J.S.A. 59:5–3.[3]

The state court granted the defendants' motion and dismissed the action, reasoning as follows:

The Court is satisfied that the alternative relief, that is damages in lieu of possession, is barred by N.J.S.A. 59:5–3.

The sole remaining issue in the case is whether or not there is a genuine issue of fact with regard to the existence, location and possession of the specific items of personal property set forth in the complaint.

Plaintiff alleges that the property was solely in the control of the defendants at the time of its disappearance and the Court accepts this argument. The defendants' affidavits filed in support of the motion to dismiss merely indicate that the defendants do not have any of the items in their possession nor do they know of their whereabouts and to the best of their knowledge they are nowhere under the individual defendant's [sic] control.

Although this controversy would appear to set up an issue of fact namely whether the particular items are presently at the State Prison, the Court is of the opinion that a fact finding hearing with regard to this issue would be meaningless. Assume that as a result of such a hearing the Court finds that the property is indeed located at the State Prison and the Court enters a judgment for possession in favor of the plaintiff. If it is indeed the intent of the defendants not to return this property to the plaintiff all they need to do is remove or destroy the

**2.** New Jersey Court Rule 4:61–2 provides that "the plaintiff in an action for replevin shall allege a demand and refusal of possession before commencing the action." In a replevin action under New Jersey law, a plaintiff is entitled to seek either the return of wrongfully dispossessed property, N.J.Ct.R. 4:61–4(c), or damages "for the value of the goods and chattels" as well as for any loss "sustained by him such as for taking and detaining them," N.J.Ct.R. 4:61–4(a).

**3.** The full text of N.J.S.A. 59:5–3 is as follows: "No action shall be commenced by or on behalf of a prisoner against a public entity or public employee until such prisoner shall be released from institutional confinement. For the purposes of the claims notification requirements and the statute of limitations contained in chapter 8 of this act, a prisoner's claim shall accrue upon his release from institutional confinement; provided, however, that a prisoner may file a notice of claim in accordance with the procedures set forth in chapter 8 at any time after an injury and nothing in this act shall bar administrative review and settlement of that claim prior to his release from institutional confinement."

A separate provision limits the scope of the Tort Claims Act to actions for damages. N.J. S.A. 59:1–4.

property prior to the appearance of the Court Officer charged with enforcing the judgment for possession. In that event, the plaintiff herein would be entitled to the alternative damages prayed for in his complaint, possibly damages for unlawful detention and possibly punitive damages, which causes of action would have to abide his release from prison.

The Court accepts the affidavits of the defendants as implying, in view of their positions, that a search of the State Prison has been made and that these articles do not exist on the premises or in the custody of any State Agency, including the state police. The complaint is dismissed and the plaintiff is left to his remedies for damages upon his release from prison.

Subsequent to the dismissal of his state court lawsuit, plaintiff filed two more claims with Trenton State Prison authorities seeking the return of lost, stolen or destroyed property or damages for the value of the property. In 1978, plaintiff petitioned the new Trenton State Prison Superintendent, Gary J. Hilton, for the return of "a substantial amount of property which included shirts, shoes, nylon underwear, (shirts and shorts), and many other items" which had been confiscated from the Sons of Diogenes Jaycees, prison chapter, of which plaintiff was the President. He was not, however, successful in obtaining the return of this property.

In 1978 and 1979, plaintiff submitted a number of claims to Superintendent Hilton and other Trenton State Prison officials seeking reimbursement for personal property which he alleged to have been destroyed in an electrical fire in his Trenton prison cell shortly after his forceable transfer to Rahway State Prison in August, 1977. The items plaintiff sought recovery for on this occasion included many articles of clothing, 4 law books, a dictionary, 10 reading books and 30 cans of food. On March 15, 1979, an officer of the prison issued a written determination that: due to "Holmans [sic] prior knowledge of the impending transfer to Rahway, and his refusal to comply with [an order which included] the packing of his personal property. . . [t]he Institution will not assume the responsibility for the items alleged to be lost."

On August 13, 1979, plaintiff instituted the present action under 42 U.S.C. § 1983. Contending that "the lost [sic] and/or destruction of [his] personal property and belongings without due process of law and just compensation violates [his] rights under the Fifth and Fourteenth Amendments" and that "N.J.S.A. 59:5–3 . . . violates the due process and equal protection clauses of the Fifth and Fourteenth Amendments," plaintiff sought, among other relief, a declaratory judgment that "the application and operation of the New Jersey statute in question. . . violate plaintiffs' [sic] rights under the United States Constitution." By letter dated December 18, 1981, plaintiff indicated his desire to move for summary judgment as to the constitutional validity of N.J.S.A. 59:5–3 alone. Arguments were heard in late April of this year.[4] The parties having agreed upon the facts, the matter is now ripe for decision as a matter of law.

2. *N.J.S.A. 59:5–3*

N.J.S.A. 59:5–3, the full text of which has been set out above at note 3, purports by its terms to bar the filing of any action by a prisoner against a public official or public entity until the prisoner has been released from prison. The legislative "Comment" to the statute, included as a note in the state code, indicates that the statute was passed "in the interest of prison harmony and in order to avoid the erosion of prison discipline as well as to discourage the bringing of frivolous suits and the traditional 'outing in court' enjoyed by many inmates in connection therewith."

The latter part of the statute provides that, although a prisoner is barred from

---

**4.** By order dated January 7, 1982, I appointed counsel to represent plaintiff for the purposes of the present summary judgment motion only, pursuant to 28 U.S.C. § 1915(d). *See Ray v. Robinson*, 640 F.2d 474 (3d Cir. 1981).

filing a judicial action prior to his release, he may nevertheless file an administrative claim in accordance with the procedures contained in chapter 8 of the New Jersey Tort Claims Act "at any time after an injury." Chapter 8 establishes, as a mandatory procedural prerequisite to filing a suit against a public entity, that an administrative claim be lodged with either the State Attorney General or the department or agency "involved in the alleged wrongful act or omission" within 90 days of injury. N.J.S.A. 59:8–7 and 8; see also N.J.S.A. 59:8–3. The ostensible purpose of the claim requirement is to permit the agency involved to "settle meritorious claims prior to the bringing of suit" and to ensure prompt notification so that the agency can "adequately investigate the facts and prepare a defense." See Comment to N.J.S.A. 59:8–3. There is no provision in the statute for any type of hearing at the claims stage, however, nor is the state agency obligated in any manner to negotiate or to effect settlement.

As a general rule, under chapter 8 of the Tort Claims Act, a person injured at the hands of the state is permitted to file a claim against the state "in an appropriate court of law" after 6 months have elapsed from the date his notice of claim was received, but is "forever barred" if suit is brought against a public entity more than 2 years after accrual of the claim. N.J.S.A. 59:8–8. The 90-day and 2-year limitations periods as applied to prisoners, however, accrue from the time the prisoner is released from institutional confinement, thus tolling the statute of limitations during the period of incarceration.

To properly assess the significance of N.J. S.A. 59:5–3, one must view it in light of the common law doctrine of sovereign immunity in New Jersey and the legislative revision of that doctrine effected by the New Jersey Tort Claims Act in 1972. Prior to 1970, the rule was firmly established that neither the State nor its agencies were susceptible to suit in the state courts absent their consent. Taylor v. New Jersey Highway Authority, 22 N.J. 454, 466, 126 A.2d 313 (1956). Individual state officials could

be sued for acts or omissions of a "ministerial" character but enjoyed immunity for "discretionary or quasi-judicial" decisions. See Kisielewski v. State of New Jersey, 68 N.J.Super. 258, 262, 172 A.2d 203 (App. Div.), certif. denied, 36 N.J. 144, 174 A.2d 927 (1961). In Willis v. Department of Conservation and Economic Development, 55 N.J. 534, 264 A.2d 34 (1970), the New Jersey Supreme Court abolished the doctrine of sovereign immunity in tort cases which did not involve "decisions calling for the exercise of official judgment or discretion", observing that "[i]t is plainly unjust to refuse relief to persons injured by the wrongful conduct of the State." Id. at 537, 540, 264 A.2d 34. It stayed the effect of its decision until January 1, 1971, however, in order to permit the New Jersey legislature to "fix the dimensions of State tort liability." See Malloy v. State, 76 N.J. 515, 518, 388 A.2d 622 (1978).

The legislature responded in 1972 with the New Jersey Tort Claims Act which, in effect, re-established the doctrine of sovereign immunity for public entities generally but created specific exceptions to the immunity doctrine. See N.J.S.A. 59:2–1 and Comment; see also Malloy v. State, supra, at 519, 388 A.2d 622. The key exception, set forth in N.J.S.A. 59:2–2, provides for state liability under a respondeat superior theory:

> a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.
>
> b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.

With certain limited exceptions, the legislature preserved the traditional rule that public employees are susceptible to suit for any acts or omissions undertaken in a "ministerial" capacity. N.J.S.A. 59:3–1 and Comment. It further provided that a public employee may be subject to liability even

where the law would otherwise confer an immunity if "his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3–14.

This brief history of the law of sovereign immunity in New Jersey demonstrates the substantial impact which the statutory provision at issue here, N.J.S.A. 59:5–3, has upon the legal rights of prisoners incarcerated in the state. Prison inmates are now theoretically entitled, as they were at common law, to a cause of action against prison officials and other public employees for injuries resulting from tortious acts committed during the performance of duties of a ministerial nature.[5] Furthermore, prisoners are entitled, by virtue of the New Jersey Tort Claims Act, to sue public officials for *any* tortious acts committed outside the scope of their employment or characterized by malice or willful misconduct. N.J.S.A. 59:3–14. Finally, inmates are entitled to a cause of action against the state itself, under a *respondeat superior* theory, for the misconduct of public officials. N.J.S.A. 59:2–2. N.J.S.A. 59:5–3 thus forecloses a prison inmate from vindicating, until he is released from confinement, a significant set of tort-based rights which he would otherwise be free to assert in the state courts.[6]

Defendants suggest that the operation of N.J.S.A. 59:5–3 is limited to actions in tort.

It is not clear, however, that the statute has such a narrow scope. By its terms, the provision bars the commencement of *any* action by a prisoner. Aside from N.J.S.A. 59:1–4, which provides that "[n]othing in this act shall affect liability based on contract or the right to obtain relief other than damages against the public entity or one of its employees," there are no express limitations to its reach. N.J.S.A. 59:5–3 could be construed, therefore, to bar claims for damages based upon federal and state statutes as well as claims based in tort.[7]

### 3. *Equal Protection and Substantive Due Process*

Plaintiff challenges the constitutionality of N.J.S.A. 59:5–3 primarily on the ground that it deprives him of equal protection of the laws and denies him "substantive" due process, in violation of the First and Fourteenth Amendments.[8] There are cases which generally support his contention. *E.g., Britt v. Suckle*, 453 F.Supp. 987, 1002 (E.D.Tex.1978); *Thompson v. Bond*, 421 F.Supp. 878 (W.D.Mo.1976); *Boling v. National Zinc Co.*, 435 F.Supp. 18 (N.D.Okl. 1976). Because the law in this area is unclear, somewhat difficult of application and possibly superseded in the present context by cases more recently decided by the Supreme Court, however, I will not rely upon equal protection or substantive due process to decide this motion.

---

**5.** It is important to note that N.J.S.A. 59:5–3 does *not*, to this extent, constitute a relinquishment by the state of its traditional sovereign immunity, cf. *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941), but restricts a previously available right of action. Indeed, at the time the New Jersey Tort Claims Act was passed, the common law doctrine of sovereign immunity had been abolished virtually in its entirety. *See Willis, supra.*

**6.** Should the inmate die before his release from custody, of course, he will never be able to assert any legal claims for damages against state officials. Presumably, a survival action could be brought on his behalf by his heirs or executor. *See* N.J.S.A. 2A:15–4. No New Jersey case has ruled on this question.

**7.** The statute might, for example, be utilized as a bar against actions initiated in the state courts by prisoners pursuant to 42 U.S.C. § 1983, claiming the denial of federal statutory

or constitutional rights. *See Maine v. Thiboutot*, 448 U.S. 1, 3, n. 7, 100 S.Ct. 2502, 2503, n. 7, 65 L.Ed.2d 555 (1980) (While it has not yet been determined whether state courts are obligated to entertain § 1983 actions, they are not barred from doing so).

**8.** Plaintiff also asserts that he has been denied "just compensation" for his loss, in violation of the Fifth Amendment and Fourteenth Amendment. Because his property has not been appropriated for a "public purpose," however, the Fifth Amendment is not strictly applicable here. *See National Board of Young Men's Christian Associations*, 395 U.S. 85, 89 S.Ct 1511, 23 L.Ed.2d 117 (1969); *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *see also San Diego Gas and Electric Co. v. San Diego*, 450 U.S. 621, 656, n.23, 101 S.Ct. 1287, 1306, n.23, 67 L.Ed.2d 551 (Brennan, J. dissenting).

Briefly stated, plaintiff argues that the First Amendment provides him with a broad right of access to the courts for the redress of any grievance recognized under state or federal law, and that this "fundamental" right may be abridged or restricted only upon the showing of a "compelling" state interest.[9] The proposition that the Constitution guarantees a right of access for the redress of *all* grievances, however, is not free from doubt.

The Supreme Court has, in the past, employed language which suggests a fairly broad constitutional right of access to the courts. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), for example, the Court observed that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts," and held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 821, 828, 97 S.Ct. at 1494, 1498. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court noted that "[t]he right of access to the courts is . . . but one aspect of the right of petition," protected by the First Amendment. *Id.* at 510, 92 S.Ct. at 611. A closer examination of the cases, however, suggests that the Court may actually have recognized a right

of access to the courts only in limited circumstances.

In *Bounds v. Smith*, the Supreme Court framed the specific question presented as "whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* 430 U.S. at 825, 97 S.Ct. at 1496. At a later point in the opinion, the Court emphasized that it was "concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights." [10] *Id.* at 827, 97 S.Ct. at 1497. *Bounds v. Smith*, therefore, may be viewed as recognizing not a general constitutional right of access to the courts for the vindication of all conceivable claims, but only for the vindication of those claims which may be characterized as of "fundamental" significance in the constitutional scheme.[11] Such a construction of *Bounds* would render it consistent with the Supreme Court's earlier statement in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that "[t]he right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Id.* at 579, 94 S.Ct. at 2986.

Of similar import are the "filing fee" cases. *See Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973);

---

**9.** For purposes of this discussion, the analyses employed under the equal protection and due process clauses are substantially the same. Just as the state may not deprive an individual of a "fundamental right" without a compelling interest, *e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), so it may not create a legislative classification (here, between prisoners and non-prisoners) which "significantly interferes" with a fundamental right absent an important interest, *e.g., Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

**10.** The Court distinguished the fundamental rights involved here from the less important rights at stake in a prisoner's petition for discretionary state court review of a criminal conviction, implying that a protected right of ac-

cess may not be available in the latter situation. *Id.* at 827, 97 S.Ct. at 1497; *see Ross v. Moffit*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974).

**11.** *Bounds* and related cases in the prison context may also be viewed as standing for the proposition that state prison officials may not place unreasonable obstacles in the way of a prisoner's access to a federal tribunal for the vindication of federal rights. *Cf. Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (State prison authorities may not impair availability of federal right of habeas corpus). From this perspective, their relevance to the present case, involving state-created rights and state courts, is limited.

*United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In *Boddie,* the Supreme Court struck down a $50 divorce filing fee as applied to indigent persons, noting that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Id.* at 377, 91 S.Ct. at 785. In *Kras* and *Ortwein,* however, the Court upheld similar filing fees, limiting *Boddie*'s application to cases involving fundamental constitutional rights over which state courts have "exclusive" control.[12]

The rights plaintiff seeks to vindicate in the present case, based upon state tort law, are clearly not "fundamental" rights, nor can they be said to lie within the exclusive control of the state courts. As noted above, the Tort Claims Act provides a mechanism for administrative review of claims and the parties are theoretically free to arrive at a private adjustment or settlement.[13] It can be argued with some cogency, therefore, that N.J.S.A. 59:5–3, though it substantially restricts a prisoner's access to the state courts, does not infringe any right which the Supreme Court has deemed to be "fundamental."

Absent a "fundamental" right or suspect classification,[14] the state statute

must be reviewed, for purposes of both equal protection and substantive due process, under the "rational basis" standard. *See Murillo v. Bambrick,* 681 F.2d 898 at 902 (3d Cir. 1982). Under this "relatively relaxed" or "minimal scrutiny" test, legislation is upheld if it "classif[ies] the persons it affects in a manner rationally related to legitimate governmental objectives." *Schweiker v. Wilson,* 450 U.S. 221, 230–34, 101 S.Ct. 1074, 1080–82, 67 L.Ed.2d 186 (1981).

Plaintiff argues, with some appeal, that N.J.S.A. 59:5–3 utterly fails to further any legitimate state end. The legislature, as noted above, has stated that its purpose in passing the provision was to promote "prison harmony," avoid the "erosion of prison discipline" and "discourage the bringing of frivolous suits and the traditional 'outing in court' enjoyed by many inmates in connection therewith." It may well be that the cause of "prison harmony" is actually furthered by *permitting* prisoners to file lawsuits, thereby channeling potentially explosive disputes between prisoners and their guards into formal and orderly channels which offer a reasonable prospect of justice and redress in the appropriate situation.[15] What is more, the effect of N.J.S.A. 59:5–3 may be simply to reroute a number of routine prison grievances from the state courts into the federal courts, thus negating any purpose which might be served by discouraging lawsuits in general.[16] Finally, the

---

12. The present case is distinguishable from the "filing fee" cases in that, here, access to the courts is not made more difficult but forbidden to prisoners altogether. The Supreme Court declined to require a waiver of bankruptcy filing fees in *Kras,* however, even though it apparently accepted the lower court's finding that Kras was utterly unable to afford the fee. *Id.* 409 U.S. at 438, 93 S.Ct. at 634. Consequently, I do not believe the distinction is a significant one for purposes of the present analysis.

13. As a practical matter, a prison inmate is likely to have exceedingly little leverage for settlement unless his release from prison is imminent. Nevertheless, nothing in the law of the state forbids him from adjusting his differences with an alleged tortfeasor as a private matter. The Supreme Court's concern in *Bod-*

*die* was that divorce could be obtained only through the state.

14. The Supreme Court has never recognized prison inmates to constitute a "suspect" classification for equal protection purposes.

15. Although the State courts refuse to accept damage actions instituted by inmates of State prisons, hundreds of such actions are filed in this Court each year under 42 U.S.C. § 1983. Many lack merit; some assert valid claims. In either event, it is very obvious that the availability of redress in the federal courts provides an outlet for tensions in the State prisons.

16. Many intentional torts, such as assault and battery, can be asserted against prison guards under § 1983 in the federal courts whether or

statute's approach toward "discouraging ... frivolous suits" suffers from the obvious defect of "throwing the baby out with the bath water" since it makes no distinction whatsoever between those lawsuits which are truly frivolous and those which might be characterized as substantial.[17] At the very least, the rationality of N.J.S.A. 59:5–3 is open to serious question.

Merely to conclude that a statute is of questionable rationality, however, does not definitively determine whether it survives scrutiny under the Equal Protection Clause and the substantive component of the Due Process Clause. The Supreme Court has quite recently emphasized that "[s]ocial and economic legislation ... that does not employ suspect classifications or impinge upon fundamental rights ... carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); *see also Murillo v. Bambrick, supra*, at ——, n. 15. In view of this quite relaxed standard, I do not believe that equal protection or substantive due process analysis provides a firm foundation for challenging the constitutionality of N.J.S.A. 59:5–3, and will not rely upon either here.

### 4. *Procedural Due Process*

A more secure basis for challenging the constitutionality of New Jersey's statute barring prison inmates' access to the state courts can be found in the Constitutional guarantee of procedural due process. Although our constitutional scheme, as currently interpreted, affords state legislatures a wide-ranging freedom to adopt social and economic measures which, in their view, promote the public welfare, the Constitution nevertheless confers certain specific rights upon individuals which the courts will protect with greater authority against the will of the majority. Among these is the Fourteenth Amendment's mandate that no state shall "deprive any person of life, liberty, or property" without affording him the minimum procedures necessary "to insure that [such interests] are not arbitrarily abrogated." *See Wolff v. McDonnell, supra*, 418 U.S. at 557, 94 S.Ct. at 2975.

■ Liberty and property interests protected under the Fourteenth Amendment may be created by state law. The minimum procedures necessary to protect those interests, however, are determined as a matter of federal constitutional law without deference to any procedural preferences expressed by the state legislature or state courts.[18] *See generally, Mills v. Rogers*, —— U.S. ——, ——, 102 S.Ct. 2442, 2449, 72 L.Ed.2d 16 (1982). The nature of the procedures which federal law will require " 'depend[s] on appropriate accommodation of the competing interests involved.' .... These include the importance of the private interest and the length or finality of the deprivation ...; the likelihood of governmental error ...; and the magnitude of the governmental interests involved." *Logan v. Zimmerman Brush Co.*, —— U.S. ——, ——, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982) (citations omitted); *see also Mathews v. El-*

not a state remedy is available, *see, e.g., Howse v. DeBerry Correctional Institute*, 537 F.Supp. 1177 (M.D.Tenn.1982). Furthermore, the recent case of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), can rationally be construed to authorize a § 1983 action for negligent loss of property where adequate state procedures are unavailable.

**17.** The courts of New Jersey, like the federal courts, already employ precisely drawn procedures for disposing of truly frivolous complaints. Actions altogether without merit may readily be dismissed either at the pleadings stage or upon a motion for summary judgment.

**18.** The Supreme Court recently stated that: "Each of our due process cases has recognized, either explicitly or implicitly, that because 'minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.' *Vitek v. Jones*, 445 U.S. 480, 491 [100 S.Ct. 1254, 1263, 63 L.Ed.2d 552] (1980).... Indeed, any other conclusion would allow the State to destroy at will virtually any other state-created property interest." *Logan v. Zimmerman Brush Co., infra*, —— U.S. at ——, 102 S.Ct. at 1155.

922

*dridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Pedersen v. South Williamsport Area School District*, 677 F.2d 312 at 316 (3d Cir. 1982).

■ For the reasons which follow, I conclude that plaintiff's theoretical right to sue the state and state officials for the negligent loss of property, under both the common law and the provisions of the New Jersey Tort Claims Act, constitutes a state-created species of property. Applying federal law, I conclude that N.J.S.A. 59:5–3 deprives him of the minimally adequate procedures necessary to protect that right of action, and therefore violates the Fourteenth Amendment.

Two key cases recently decided by the Supreme Court are largely determinative of the outcome here: *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Logan v. Zimmerman Brush Co.*, —— U.S. ——, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Because at first blush these cases may not seem fully consistent, some effort to reconcile their holdings is required.

In *Parratt*, a state prison inmate filed suit in federal court under 42 U.S.C. § 1983 contending that his property had been "negligently lost by prison officials in violation of his rights under the Fourteenth Amendment to the United States Constitution." Specifically, he claimed that he had been deprived of his property without due process of law. As relief, he sought damages of $23.50, the value of the property lost.

Writing for the majority, Justice Rehnquist undertook the following analysis of the case: First, he posed the question whether "mere negligence will support a claim for relief under § 1983," an issue hitherto undecided by the Court. *Id.* 451 U.S. at 532, 101 S.Ct. at 1911.[19] Answering this question in the affirmative, he then inquired whether the officials who allegedly lost the plaintiff's property could be said to have acted "under color of state law." Answering this question in the affirmative as well, he concluded that the plaintiff had been deprived, albeit negligently, of a protected property interest—his hobby kit—under color of state law. He then framed the ultimate question as whether plaintiff had been deprived of his property "without due process of law." *Id.* 451 U.S. at 537, 101 S.Ct. at 1913.

The thrust of the complaint in *Parratt* was unquestionably of a substantive nature. The plaintiff contended, in essence, that the very act of the prison officials in losing his property had deprived him of a constitutional right.[20] Justice Rehnquist, however, chose utterly to disregard the substantive aspects of the complaint and treated the complaint as a challenge to the procedures available under state law for the redress of negligent deprivations of property. *See id.* at 552–53, 101 S.Ct. at 1921–22 (Powell, J. concurring). The question to be decided, he stated, was "whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy the requirements of procedural due process."[21] *Id.* at 537, 101 S.Ct. at 1914.

**19.** For reasons which I shall develop more fully below, I believe that Justice Rehnquist's holding on the issue of negligence was unnecessary to the resolution of the case and constitutes a highly problematic view of the law.

**20.** As Justice Powell pointed out in his concurring opinion, "[t]he Due Process Clause imposes substantive limitations on state action, and under proper circumstances these limitations may extend to intentional and malicious deprivations of liberty and property, even where compensation is available under state law." *Id.* at 552–553, 101 S.Ct. at 1921. These substantive limitations exist even where procedural prerequisites have been satisfied.

**21.** There is no indication in the Court's opinion that plaintiff ever attempted to make a claim for his property under state law or that he ever challenged the procedures available under state law. Had Justice Rehnquist reached the substantive due process issue, there can be little doubt that he would have concluded that allegations of negligence alone are not sufficient to state a violation of the Due Process Clause. *See id.* at 553, 101 S.Ct. at 1921 (Powell, J. concurring). Writing for the majority in *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), Justice Rehnquist stated that: "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of

Weighing the tort remedies provided all persons under Nebraska's tort claims statute (the statute contained no special provisions applicable to prisoners only), Justice Rehnquist concluded that they satisfied the minimum requisites of procedural due process. First, he pointed out, although the tort remedy provided a hearing only after the deprivation had occurred, the Due Process Clause had never been construed to require predeprivation procedures when to do so would be impractical. "The fundamental requirement of due process," he observed, "is the opportunity to be heard ... 'at a meaningful time and in a meaningful manner.'" *Id.* at 540, 101 S.Ct. at 1915, *quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Since the state could not possibly "predict precisely when [a negligent] loss will occur," a reasonably prompt postdeprivation remedy was constitutionally adequate. Justice Rehnquist acknowledged that the tort claims provision in question "provide[d] for an action against the State as opposed to its individual employees ..., contain[ed] no provisions for punitive damages, and [pro-

vided] no right to a trial by jury." *Id.* 451 U.S. at 543–44, 101 S.Ct. at 1917. Nevertheless, he found, "[t]he remedies provided could have fully compensated the respondent for the property loss he suffered" and hence were "sufficient to satisfy the requirements of due process." *Id.* at 544, 101 S.Ct. at 1917.

If one takes the *Parratt* opinion at face value, it appears to stand for the proposition that states are obligated, as a matter of constitutional law, to provide persons whose property has negligently been lost by state officials with a meaningful postdeprivation remedy. Applying *Parratt* to the facts here, it is readily apparent that New Jersey does not provide prison inmates with access to a postdeprivation remedy within a meaningful time. Hence, *Parratt* alone provides a compelling basis for the conclusion that N.J.S.A. 59:5–3 is unconstitutional.

The *Parratt* opinion is confusing, however, and raises a number of difficult questions.[22] Much of the confusion engendered

injury must be sought in state court under traditional tort law principles. Just as '[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner,' *Estelle v. Gamble,* 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251] (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." *Id.* at 146, 99 S.Ct. at 2695. There is little basis for distinguishing between the deprivation of liberty at issue in *Baker* and the deprivation of property at issue in *Parratt*—the question posed in either case is whether the term "deprive," as used in the Fourteenth Amendment, extends to negligent action by state officials. Because Justice Rehnquist viewed the due process problem in *Parratt* as involving procedural rights only, one can only speculate as to the substantive significance of his remarks on the actionability of negligence under § 1983.

**22.** If a negligent loss of property gives rise to procedural rights under the Constitution, does it also give rise to substantive constitutional rights? *See id.* at 553, 101 S.Ct. at 1921 (Powell, J. concurring). In other words, need a state merely provide a hearing after a state official deprives an individual of property through an act of negligence, or must that hearing also result in an award of compensation if the circumstances reasonably warrant it? Justice

Rehnquist certainly seemed to imply in *Parratt* that the procedural remedies afforded by the state could not be totally empty—mere exercises in futility. Does it follow, then, that states are required by the Constitution to provide a remedy for every conceivable act of negligence which a state official might perform? Such a conclusion would appear to clash directly with the Supreme Court's earlier statement in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), that "the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *Id.* at 282, 100 S.Ct. at 557. In *Martinez,* the Supreme Court held that a state statute which conferred upon public employees absolute immunity from liability for any injury resulting from a determination to release a prisoner on parole did not deprive a released prisoner's victim of any constitutionally recognized right to liberty or property. The state, not the Constitution, the Court held, was entitled to determine the scope of negligence liability, within the boundaries of rationality.

If a state provided no tort remedy at all against state officials, would a person injured by a state official's negligent act then become entitled to bring an action in federal court under § 1983 alleging that the negligent act vio-

by the decision in Parratt can be cleared up if one views its holding in the light of the more recently decided case of *Logan v. Zimmerman Brush Co., supra.* Reading both cases together, a sounder basis can be formulated for analyzing the constitutionality of N.J.S.A. 59:5–3.

In *Logan,* the plaintiff filed a complaint before the Illinois Fair Employment Practices Commission complaining that he had been discriminated against in his employment on the basis of a "physical . . . handicap unrelated to ability," in violation of the Illinois Fair Employment Practices Act. Following the filing of such a charge, the state statute provided that the Commission was to convene a factfinding conference on the claim within 120 days. Due to inadvertence, however, the Commission failed in plaintiff's case to convene its factfinding conference within the requisite 120-day period. The Illinois Supreme Court then held that this time limitation was "jurisdictional" in nature, could not be waived and forever barred plaintiff from bringing his state-created employment discrimination claim.

Employing a procedural due process analysis, the Supreme Court reversed.[23] As an initial matter, it held that the plaintiff was entitled to the protection of the Due Process Clause because his state-created right of action constituted a "species of property protected by the Fourteenth Amendment." *Id.,* —— U.S. at ——, 102 S.Ct. at 1154.

Such a property right accrues under state law, the Court implied, whenever an aggrieved "claimant has more than an abstract desire or interest in redressing his grievance"—that is, whenever "his right to redress is guaranteed by the State, with the adequacy of his claim assessed under what is, in essence, a 'for cause' standard, based upon the substantiality of the evidence." *Id.* at ——, 102 S.Ct. at 1155.

The Court then quickly disposed of defendant's argument that strict compliance with the 120-day limitation constituted a substantive element of the cause of action for employment discrimination, and that the State, not being required to enact such a statute at all, was entitled to place any conditions on the substantive scope of relief which it chose. "Of course," the Court observed, citing *Martinez, supra,* "the State remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether—just as it can amend or terminate its welfare or employment programs." *Id.* Nevertheless, it held, "[t]he 120-day limitation in the FEPA . . . involves no such thing. It is a procedural limitation on the claimant's ability to assert his rights, not a substantive element of the FEPA claim." *Id.*

Finally, the Court addressed the adequacy of the procedures provided by the State for the vindication of FEPA claims under

lated his constitutional rights? If so, how could he recover damages in the face of the well-established doctrine that state officials are entitled to a qualified or "good faith" immunity? *See Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A state official who acts in a merely negligent fashion lacks, by definition, the state of mind necessary to overcome a qualified immunity defense. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (Prison officials entitled to qualified immunity where charged with "negligent and inadvertent" interference with a prisoner's mail). Due to the Eleventh Amendment, a prisoner suing in federal court for damages, pursuant to § 1983, would not be entitled to recover against the state. Moreover, he could not join as a defendant a tortfeasor's employer, since a *respondeat superior* theory is unavailable under § 1983. *See Parratt, supra,* 451 U.S. at 537, n.3, 101 S.Ct. at 1913, n.3. For

all intents and purposes, therefore, a substantive right to recover under § 1983 itself for damages occasioned by the negligent loss of property, triggered by the lack of effective "process" at state law, would be meaningless.

Finally, *Parratt* raises the question whether the Due Process Clause should be construed to bar the assertion of *any* claim under § 1983, whether the official conduct complained of is intentional or not, as long as there are tort remedies available under state law which could provide redress for the same wrong. *Compare Rutledge v. Arizona Board of Regents,* 660 F.2d 1345 (9th Cir. 1981), with *Tarkowski v. Hoogasian,* 532 F.Supp. 791 (N.D.Ill.1982).

**23.** Although equal protection claims were raised by the plaintiff and relied upon by the dissenters, the majority did not address the equal protection issue.

federal constitutional standards and concluded that they did not pass muster. Observing that plaintiff's interest in retaining his job and redressing the alleged discrimination was substantial, that the deprivation was final, that the random nature of the requirement presented an "unjustifiably high risk that meritorious claims [would] be terminated" and that the state interests furthered by the requirement were "insubstantial," the Court held that the procedure by which a claim could be terminated through no fault of the claimant failed to meet the minimum requirements of procedural due process. "What the Fourteenth Amendment ... require[s]," the Court held, "... is 'an opportunity ... granted at a meaningful time and in a meaningful manner' ... 'for [a] hearing appropriate to the nature of the case' .... It is such an opportunity that Logan was denied." *Id* at ——, 102 S.Ct. at 1159 (citations omitted).

If one applies the reasoning of the *Logan* case to the facts presented in *Parratt*, many of the difficulties created by the Supreme Court's decision in *Parratt* can be resolved. First and foremost, it is apparent that it was not necessary for the Court to declare in *Parratt* that the negligent loss of personal property by state officials constituted a "deprivation" within the meaning of § 1983 and the Fourteenth Amendment,[24] thus creating a conflict with the earlier established rule that states should remain free to determine, within reason, the boundaries of state tort law.[25] *See Martinez v. California, supra.* Rather, *Parratt* could have been resolved on the understanding that the true property issue at stake was the *cause of action* for negligent property loss—or for any other type of injury to person or property occasioned by state officials—which the State had previously made available by virtue of its tort claims statute. In this fashion, it would be possible to avoid making the Fourteenth Amendment "a font of tort law," *see Parratt, supra*, 551 U.S. at 552, 100 S.Ct. at 1921, *quoting Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (Powell, J. concurring), yet at the same time preserve the right of persons injured within the meaning of state law to obtain a meaningful hearing on their claims.

Whatever future treatment *Parratt* receives at the hands of the Supreme Court, however, it is apparent that the holding of the case rests on sound doctrinal ground if analyzed in light of the principles articulated in *Logan*. By the same token, the principles of *Logan* may appropriately be applied to the facts of the present case.

It is undisputed that plaintiff here has a right of action under state law to sue both public employees and the state itself for negligent loss of property. By virtue of N.J.S.A. 59:5–3, however, he is barred from asserting his cause of action until such time as he is released from institutional confinement.

N.J.S.A. 59:5–3 cannot be defended on the ground that it constitutes a substantive component of a New Jersey prisoner's right to sue the state. *See Logan, supra*, —— U.S. at ——, 102 S.Ct. at 1156; *Martinez v. California, supra.* The statutory provision does not affect the scope of the inmate's right of recovery in any fashion whatsoever. Rather, it controls the time and manner in which an inmate is permitted to bring his claims to the attention of the court and obtain a hearing. As such, it must be viewed as a procedural provision which falls squarely within the ambit of the Due Process Clause.[26]

---

**24.** It is worthy of note that Justice Rehnquist never held in *Parratt* that negligence is sufficient to state a claim under the Due Process Clause of the Fourteenth Amendment. He stated *only* that a showing of intent is not required by 42 U.S.C. § 1983.

**25.** The states, for example, have traditionally been permitted to apply and develop their own principles of sovereign immunity from suit under state law. Prior to *Parratt*, the Supreme Court had never suggested that such sovereign immunity from negligence suits might be unconstitutional.

**26.** The Supreme Court noted in *Logan* that statutes of limitation fall within the category of procedural requirements and must be reasonable. The statute at issue here can be viewed as a "statute of limitations in reverse," granting prison officials with temporary, as opposed to permanent, repose.

In order to determine whether the procedures available to New Jersey prison inmates to vindicate acknowledged tort rights against the state and state officials are constitutionally adequate, it is necessary to weigh all of the interests involved. *See Logan, supra,* at ——, 102 S.Ct. at 1157. Plaintiff's interest, of course, is quite substantial. As a prison inmate, his personal property holdings are necessarily quite limited. His interest in retaining possession of his personal property, therefore, or obtaining its value if lost, is of no small moment to him even if it might seem relatively trivial to one not incarcerated.

The deprivation effected by N.J.S.A. 59:5–3 is not, like the deprivation effected by the 120-day limitation provision in *Logan,* final in all cases. A prison inmate who has a relatively short sentence may regain his right of action in a reasonable amount of time and successfully litigate a damages action. In plaintiff's case, however, as in the case of many other prison inmates suffering long-term or life sentences, the bar to suit imposed by N.J.S.A. 59:5–3 is, for all intents and purposes, a final one. Even if such a prison inmate does obtain release from confinement prior to death, he probably will not be able, as a practical matter, to marshall the witnesses and evidence necessary to prove his case and will thereby lose his cause of action *de facto.*

For many of the same reasons, it is clear that the procedural hurdle created by N.J.S.A. 59:5–3, like the 120-day limitation provision in *Logan,* creates "an unjustifiably high risk that meritorious claims will be terminated." *Id.* at ——, 102 S.Ct. at 1157; *see also Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903. During the time lag between the accrual of a prisoner's cause of action and the time when he is released from prison and can commence his action, it is quite likely that key witnesses will die or become unavailable; that documentary evidence will be mislaid or destroyed; or that the defendant or defendants allegedly responsible for the injury will no longer be locatable. Hence, even if plaintiff is able to assert his cause of action eventually, the time delay occasioned by

N.J.S.A. 59:5–3 will substantially enhance the likelihood of an erroneous decision.

The public interest served by prohibiting prisoners from filing suits against prison officials until release from confinement is not, for the reasons stated in the previous section of this opinion, particularly strong. The ostensible purposes of the statute are to promote "prison harmony," to discourage "frivolous lawsuits" and to prevent prisoners from enjoying an "outing in court." Whether the statute rationally furthers these aims, however, is open to question. Furthermore, to the extent that the bar on prisoner suits dilutes the deterrent effect of state negligence law and promotes official carelessness, the public interest is obviously disserved.

Weighing these interests, I conclude that the effect of N.J.S.A. 59:5–3 is to deny New Jersey prison inmates the minimally adequate procedures to which they are entitled under the Constitution for the vindication of their state-created right to sue the state and state officials for the negligent infliction of injuries to person or property. The states may or may not be required under the federal Constitution to provide tort remedies against state officials. Once they create such rights of action, however, they must provide for a "hearing appropriate to the nature of the case . . . at a meaningful time and in a meaningful manner." *Logan, supra,* at ——, 102 S.Ct. at 1159. Here, as in the *Logan* case, the state has created an "established procedure" which "destroys [plaintiff's] entitlement without according him proper procedural safeguards." *Id.* at ——, 102 S.Ct. at 1158.

### 5. *Summary and Conclusion*

For the reasons advanced in this opinion, I conclude that plaintiff is entitled, on the undisputed facts, to judgment as a matter of law with respect to his claim that N.J.S.A. 59:5–3 violates the Fourteenth Amendment of the Constitution. I shall therefore issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, to this effect. Any further remedies to which plaintiff may be

entitled by virtue of this decision must await further proceedings.[27]

The Court will enter its own order implementing the rulings of this opinion. Should defendants wish to have prompt appellate review of this determination, I would entertain an application under 28 U.S.C. § 1292(b). *See Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976).

---

[27.] Having demonstrated that he has unconstitutionally been denied a forum in which to vindicate substantial state-created rights, plaintiff may be entitled to damages in the present action for the proximately resulting monetary loss. Such damages, however, must be proved. Plaintiff may wish to prove his damages by way of an appropriately documented summary judgment motion.